UNITED STATES v. NEW YORK CENT. & H. R. R. CO.

(Circuit Court, W. D. New York. April 6, 1911.)

1. **CARRIERS (§ 37\*)—TRANSPORTATION OF CATTLE—28-HOUR LAW—FAILURE TO FURNISH WATER.**

Where cattle were transported in patent cattle cars, equipped with troughs affording an opportunity to water them without unloading, but the cattle were kept in the cars for a period longer than that authorized by statute, without water being introduced in the troughs for at least a part of the cattle, the carrier was liable for the penalty provided by the 28-hour law (Act June 29, 1906, c. 3594, 34 Stat. 607 [U. S. Comp. St. Supp. 1909, p. 1178]).

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 37.\*]

2. **CARRIERS (§ 37\*)—TRANSPORTATION OF CATTLE—SPACE.**

Where, in the shipment of cattle from Chicago to New York, one of the cars, 36 feet long, contained 21 bulls, tied side by side to alternate sides of the car, and in a number of other cars from 18 to 19 large cattle were carried, the cars were too heavily loaded; it appearing by uncontradicted proof that cattle under transportation should have at least 2½ feet of space for each animal.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 37.\*]

Action to recover a penalty by the United States of America against the New York Central & Hudson River Railroad Company. Judgment for the United States.

John Lord O'Brian, U. S. Atty.

Hoyt & Spratt (Alfred L. Becker, of counsel), for defendant.

HOLT, District Judge. This action is brought to recover a penalty under Act June 29, 1906, c. 3594, 34 Stat. 607 (U. S. Comp. St.

Supp. 1909, p. 1178), to prevent cruelty to animals while in transit by railroad, commonly called the "28-Hour Law." That act provides that no railroad transporting cattle from one state to another shall confine them in cars more than 28 consecutive hours, which in certain cases may be extended to 36 hours, without unloading them for rest, water, and feeding. The act also provides that:

"When animals are carried in cars, boats, or other vessels in which they can and do have proper food, water, space, and opportunity to rest the provisions in regard to their being unloaded shall not apply."

On March 7, 1910, 17 car loads of cattle were shipped from Chicago to New York City. The time of confinement had been duly extended to 36 hours. They were delivered to the defendant at Suspension Bridge. At that time they had been confined 32 hours and 15 minutes. The defendant then transported the cattle to Newberry Junction, Pa., where they were delivered 18 hours later, after a continuous confinement of 50 hours and 20 minutes. The cattle were delivered at Newberry Junction to the Philadelphia & Reading Railroad, to be transported to New York. It was, in substance, a shipment from Chicago to New York, a total run of about 65 hours.

These cattle were all carried in what are called "patent cattle cars," which purport to afford proper food, water, space, and opportunity to rest to the cattle without their being unloaded. All of these cars were arranged with hayracks, and with a space at the top of the car in which hay could be placed, from which it was to fall down into the rack. Some of the cars had, and some had not, arrangements for watering the cattle in the car. The cars which had such arrangements were furnished with four sets of pans, with four pans to each set, each set fastened on a pipe, on which they turned as on a pivot. There was a door in the center of each car, on each side, and one of the four sets of pipes and pans ran from each end of the car to the center door on each side. When not in use, the pans could be turned up against the side of the car. When required to be used for watering the cattle, they were turned down in a horizontal position, and water was introduced by a hose into one of these pans, which was connected by the pipe with the other pans, so that the water from the hose ran through the pipe into all the pans. When these pans were turned down for the cattle to drink, there was no appliance for holding them secure in a horizontal position, and it was a common thing for them to be tipped over by the cattle, and the water spilled out. Frequently the men in charge, when watering the cattle, used various appliances to secure them in position.

The only place between Chicago and Newberry Junction in which any hay or water was supplied to the cattle was Suspension Bridge. At Suspension Bridge the cattle in the cars in which there was no provision for supplying water in the car were unloaded and given water, and then reloaded. In the other cars the cattle were not unloaded. Four of the cars contained bulls, each tied, the first one to one side of the car, and the next to the other side, in alternation. The train arrived at Suspension Bridge about midnight. There was a platform in front of the stockyards there, a little longer than eight

cars. It was usual to take down from each cattle train eight cars, and unload those to be unloaded, and supply feed and water to the patent cars. There were hydrants and hose there with which to furnish water. The hose used for supplying water to the cars was rather short, although there was an extra length of hose, which was frequently used there in order to convey the water to the further side of the cars.

[1] The evidence satisfies me that on the night in question no water was introduced at Suspension Bridge into the troughs on the further side of the four cars containing the bulls, and that in two other cars the cattle tipped up the pans, and the water spilled out, and no more was provided, so that they practically got no water there. I think that this particular type of cars ought to be provided with some apparatus which would securely fasten the pans, when placed in a horizontal position to receive water, so that they could not be tipped over until the fastenings were removed.

The government claims that a number of these cars contained no hay on their arrival at Suspension Bridge, and that no hay was put in the cars there. This is positively testified to by Mr. O'Leary, the government inspector, who was there on the night in question. Kinney, the manager at the Suspension Bridge Stockyards, and McQuillan, his assistant, testified that they had no special recollection of what took place on the night in question, but that it was their uniform practice to put hay in all the cars that needed it, and O'Leary admits that they did put hay in one of the cars on the train. Kinney and McQuillan both impressed me as honest witnesses and as careful, prudent men.

It is for the interest of the shippers to have their cattle properly fed on these trips, as the cattle always shrink in weight to some extent on long journeys, and their weight as beef is worth more than the weight of the hay. It is also to the interest of the railroad to furnish hay, because whatever hay is furnished is sold and charged to the shippers at a profit. I think, if Kinney furnished hay to one car, he probably would have furnished it to the other cars, if he had thought they needed it. Kinney may possibly have seen that there was sufficient hay remaining in the other cars, which O'Leary may not have seen. Upon the whole evidence, I think there is sufficient doubt in the case whether there was any neglect to furnish the necessary amount of hay at Suspension Bridge to prevent the recovery of a penalty on that ground.

[2] It is also claimed that in this shipment cattle were packed so tightly in some of these cars that they did not have proper space and opportunity to rest. In one of the cars, 36 feet long, 21 bulls were tied side by side, and in a number of them 18 and 19 large cattle were carried. I do not think that they had sufficient space to lie down, certainly not without danger of being injured by being trampled on by the others. It is probably true that they would not all want to lie down at one time; but to compel cattle to stand for 65 hours continuously under such wearisome conditions as must attend a transportation by rail for such a period of time is clearly a serious form of cruel-

ty. The evidence is uncontradicted that cattle under transportation ought to have at least 2½ feet of space for each animal. That is the space required by the United States statute relating to shipment of cattle at sea, and obviously it seems a small enough space to be occupied by cattle anywhere. I think that the charge that the cattle transported in some of these cars did not have proper space and opportunity·to rest is established.

The transportation of cattle on railroads for long distances at the best involves a good deal of hardship and suffering. The provisions of the act for their protection are conservative enough, and should be strictly enforced, particularly in the matter of furnishing them water. The evidence shows that many cattle, while being transported on a railroad, will not eat much; but they become excited and feverish, and want a good deal of water. To transport cattle from Chicago to New York without giving them any water on the way is serious cruelty.

My conclusion is that the government should have judgment in this case for the penalty demanded of $500, with costs.