UNITED STATES v. NEW YORK CENT. & H. R. R. CO.

(Circuit Court, W. D. New York. July 5, 1911.)

Nos. 311, 312.

1. CARRIERS (§ 37*)—CARRIAGE OF LIVE STOCK—28-HOUR LAW—CONSTRUCTION.
    To bring a case within the proviso of section 3 of the 28-hour law (Act
    June 29, 1906, c. 3594, 34 Stat. 608 [U. S. Comp. St. Supp. 1909, p. 1179]),
    which exempts a carrier of live stock from compliance with the require-
    ments of unloading the same at least once in 28 hours for rest, water,
    and feeding "when the animals are carried in cars * * * in which
    they can and do have proper food, water, space and opportunity to rest,"
    the cars must not only be properly equipped for such purposes, but it is
    incumbent on the carrier to see that the animals do have proper and
    sufficient quantity of food and water supplied where they can reach it,
    and that they are not so overcrowded but that they have sufficient space
    for all to lie down at the same time.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec.
    Dig. § 37.*]

2. CARRIERS (§ 37*)—CARRIAGE OF LIVE STOCK—28-HOUR LAW—CONSTRUCTION.
    Where cars of cattle are loaded at nearly the same time, although at
    different points, are forwarded to the same destination, the consignor
    and consignee are the same, and they are consolidated into one train and
    so received by a connecting carrier, the failure of such carrier to unload
    the same for rest, water, and feeding as required by 28-Hour Law June
    29, 1906, c. 3594, § 1, 34 Stat. 607 (U. S. Comp. St. Supp. 1909, p. 1178),
    constitutes but one violation of the statute.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 95, 927; Dec.
    Dig. § 37.*
    Liability of carrier for failure to feed, water, and rest live stock, and
    for violation of 28-hour law, see note to St. Joseph Stockyards Co. v.
    United States, 110 C. C. A. 435.]

Actions by the United States against the New York Central & Hud-
son River Railroad·Company. Cases consolidated, and judgment for
plaintiff.

John Lord O'Brian, U. S. Atty.
Hoyt & Spratt (Alfred L. Becker, of counsel), for defendant.

HAZEL, District Judge. The object of actions Nos. 311 and 312 is
to recover penalties which the government claims have been incurred
by the carrier for violation of the 28-hour law, so-called, approved
June 29, 1906. By consent of the parties, and pursuant to order of
this court, the said actions, which in material matters are similar,
were tried together, and at the conclusion of taking testimony the de-
fendant moved that they be consolidated upon the authority of Balti-
more & Ohio Southwestern Railway Company v. United States, 220
U. S. 94, 31 Sup. Ct. 368, 55 L. Ed. 384, decided by the Supreme
Court March 20, 1911, and that under the proofs there could at all
events have been but one violation of the statute. Before deciding
the motion for consolidation, a brief statement of the facts will be
given.

The shipment of cattle in action No. 311 originated at Chicago, Ill.,
on March 17, 1910; the loading being completed at 1:35 o'clock p. m.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

central standard time. The animals were transported in 16 cars to Suspension Bridge, N. Y., by the Michigan Central Railroad Company, and there on the next day delivered in cars to the defendant carrier at 9:55 o'clock p. m. central standard time, from whence they were transported to Jersey City, via Newberry Junction, Pa, arriving on March 19, 1910, at 6:40 o'clock p. m., having been en route 52 hours and 5 minutes, and constantly confined without having been unloaded or properly fed or watered save as they were watered and fed at Suspension Bridge and as hereinafter stated.

The shipment of cattle in action No. 312, consisting of eight cars, originated at Joliet, Ill., March 17, 1910; the loading being completed at 1:30 o'clock p. m. central standard time and delivery made to the defendant carrier at Suspension Bridge at the same time that delivery was made of the first-mentioned shipment, from whence the transportation proceeded to Newberry Junction, Pa. The total time of shipment was 52 hours and 10 minutes. The government claims that the cattle were given some water and food at Suspension Bridge, but that they were not properly fed or watered, and that each car was so overloaded that the cattle had no proper opportunity and space for rest. The cars were so-called patent cattle cars, which are supplied with hayracks and watering pans.

The evidence of the government as to action No. 311 was confined to seven cars, and it is shown that in each of six cars there were contained about 18 head of cattle weighing on an average approximately 1,200 pounds; that to the animals in five cars water was turned into the pans on one side of the cars only; that in the sixth car water was let into the pans on one side, but the horned cattle in the cars, about one-half in number, were unable to drink on account of interference with the side of the car just above the watering pans. In the seventh car there were confined 16 bulls of the average weight of 1,600 pounds, which originally had been tied with their heads alternating to each side of the car, but 14 were loose, and the others were tied in such a way as to make it impossible to reach the watering pans. The animals in five cars out of the seven were given no food whatever, although the floor of the car in which the bulls were confined was strewn with hay by defendant's employés on the unloading side. The government gave testimony by witnesses, who were familiar with the habits of cattle on the farm and during transportation, showing that the cattle in question measured across the hips from 19½ to 23 inches and from 24 to 30 inches through the protuberant portions of their bodies; that in their opinion cattle in transit require about 15 pounds of hay per head for each 24 hours; that in lying down animals weighing 1,600 pounds require from 31 to 36 inches of space, while animals weighing but 1,200 pounds require about 29 inches. From the evidence it is apparent that 16 animals weighing on an average 1,200 pounds constitute a car load of ordinary dimensions.

[1] The testimony of the defendant indicates that it was the practice to put hay in the cars at Suspension Bridge Stockyards whenever it was necessary, and the superintendent of the stockyards testified that so far as he knew the custom or rules for feeding were

carried out by the subordinates. But I think the testimony of the government inspectors, who kept such cars under observation for the purpose of ascertaining the quantity of food given to each car, is sufficiently clear to warrant the conclusion that the cattle were not properly fed and watered. In some instances insufficient hay was given, in others not enough hay or water, and in some cars the cattle could not get at the water. Testimony was given by the defendant that customarily all the cattle in a car will not lie down; that more often a number stand while others lie; that sufficient hay and water was put in the cars. I think the predeliction of the animal would be to lie down in transit if the conditions permitted; that more space should have been provided, and so many should not have been put in the cars. Regard must be had to the weight of the cattle in placing them in cars of the kind in which the shipments were made. The statute provides that cattle shall not be confined continuously for more than 36 hours unless they are carried in cars in which they can and do have proper food and water and opportunity for rest. It will be noticed that it is optional with the carrier to either unload the cattle for rest, food, and water, or to give them proper food, water, and rest or opportunity for rest while in transit without unloading. Congress primarily intended that cattle should be unloaded every 28 or 36 hours; but, if the cars are properly equipped and suitable for food and rest, then unloading was not required. When, therefore, the cars are not unloaded, all the animals contained therein must have sufficient space for lying down at the same time. The probabilities are that they will not all lie at the same time, but nevertheless opportunity must be given them to do so. In a recent case for violation of the statute under consideration (U. S. v. New York Central & Hudson River Railroad Co. [C. C.] 186 Fed. 541) it was said by Judge Holt:

"It is probably true that they would not all want to lie down at one time, but to compel cattle to stand for 65 hours continuously under such wearisome conditions as must attend a transportation by rail for such a period of time is clearly a serious form of cruelty. The provisions of the act for their protection are conservative enough, and should be strictly enforced, particularly in the matter of furnishing them water."

With this holding I am in entire accord. My conclusion on the evidence is that the cattle were not properly fed or watered, and, moreover, that they did not have proper space and opportunity for rest.

[2] The actions, however, must be consolidated, as I think, within the ruling made recently by Justice Lamar, in Baltimore & Ohio Southwestern Railway Co. v. United States, supra, speaking for the Supreme Court, there was but one violation of the statute. The cars, though loaded at different points, viz., at Chicago and at Joliet, Ill., were nevertheless, as was conceded at the hearing, consolidated into one train at Michigan City, Mich., and were subsequently delivered to the connecting carrier, the defendant, at Suspension Bridge, N. Y., at the same time. The consignors and consignees were the same in both cases, and the destinations of the animals the same. While it may be true that the legal period of confinement of the cattle first loaded at Joliet expired a few minutes earlier than that of the shipment which originated at Chicago, there was practically but one of-

fense, and the slight difference in the time when the lawful period expired is insignificant, and therefore, giving the statute a reasonable construction, may be disregarded.

A decree may be entered covering both actions for a penalty of $500, with costs.